### In re TINDAL.

(District Court, E. D. South Carolina. June 27, 1907.)

BANKRUPTCY—PREFERENCES—KNOWLEDGE OF CREDITORS—EVIDENCE—FINDINGS.

Evidence *held* to sustain a referee's finding that certain mortgagees, who took their mortgages within four months before the filing of a bankruptcy petition, had no knowledge that at the time the mortgages were given the bankrupt was insolvent, and that a preference was intended, but that another mortgagee, whose mortgage was executed only eight days before the bankruptcy petition was filed, had sufficient knowledge of the bankrupt's actual condition to put him on inquiry, and his mortgage was therefore void as a preference.

Lee & Moise, for Harby.
Haynsworth & Haynsworth, for Norris.
Smythe, Lee & Frost, for creditor unsecured.
C. Du Rant, for bankrupt.

The following is the opinion of I. C. Strauss, Referee:

"On the 18th day of March, 1907, at a meeting of creditors in the above-styled matter, A. D. Harby, as executor of and trustee under the will of Horace Harby, deceased, for and in behalf of his coexecutors and trustees and himself, offered for allowance as a secured claim proof in the form prescribed by law of an indebtedness due to the estate of Horace Harby by the bankrupt, evidenced by a bond executed by the bankrupt on the 1st day of November, 1906, conditioned for the payment of $2,442.43, on the 1st day of February, 1907, with interest from date at the rate of 8 per cent. per annum, payable annually. unpaid interest to bear interest at the same rate; the security therefor consisting of a mortgage executed on the same day by the said bankrupt, covering all of the right, title, and interest of the bankrupt, being an undivided sixth interest and share in and to the property and estate of James E. Tindal, deceased, real and personal. Objections were entered by the trustee to the allowance of this claim as a secured claim, on the ground that the execution of the mortgage in question constituted a preference, under section 60a of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], in favor of Harby & Co., and, under section 60b of the bankruptcy act, was voidable at the suit of the trustee. No charge was made by the trustee that the said mortgage was executed by the bankrupt with intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, and that this transaction did not fall within the inhibition of section 67e of the act. Testimony was taken. The bond and mortgage in question are in evidence, and were in fact filed with the proof. The bond was executd by A. J. Tindal unto 'H. J. Harby in his own right. and H. J. Harby, A. J. Harby, J. M. Harby, and Horace Harby, as executors and trustees under the will of Horace Harby, deceased, doing business as Harby & Co.' The condition of the bond was stated in the following language: 'That if the above bound A. J. Tindal, his heirs, executors, and administrators, shall and do well and truly pay or cause to be paid unto the above-named H. J. Harby, in his own right, and H. J. Harby, A. D. Harby, J. M. Harby, and Horace Harby as executors and trustees under the will of Horace Harby, deceased, doing business as Harby & Co., their certain attorneys, etc., the full sum of twenty-four hundred and forty-two and $^{43}/_{100}$ dollars,' etc. The mortgage recited the bond as having been executed unto the executors and trustees under the will of Horace Harby, deceased, and in no way referred to the copartnership existing under the firm name of Harby & Co. H. J. Harby, in testifying, and his counsel, took the position that the estate of Horace Harby was the owner of the bond and mortgage in question, and had loaned the money secured thereby to the bankrupt on the date of the papers, and was an innocent purchaser for a present bona fide consideration. The trustee took the position that the bond and mortgage were executed primarily to secure Harby & Co. The testimony shows, and it was conceded by counsel on both sides, that the bond and mortgage were executed (1) for an advance in money made at the time of $500; and (2) for the purpose of paying Harby & Co. $1,900 for fertilizers advanced in the spring of 1906. Harby & Co. is a mercantile copartnership, consisting of H. J. Harby in his own right and of the estate of Horace Harby. Henry J. Harby managed the business of Harby & Co., and was the leading spirit and practically the sole manager of the affairs of the estate of Horace Harby; he being one of the executors and trustees under the will of the said Horace Harby.

"The bond and mortgage in question are indorsed as follows: 'For value received, the within security and the debt thereby secured are assigned unto the estate of Horace Harby. [Signed]  Harby & Co. [L. S.].' The bond and mortgage are dated 1st November, 1906. The check of Harby & Co. on the Sumter Savings Bank for the sum of $500, dated November 14, 1906, was introduced in evidence to show the cash payment of $500 said to have been made at the time of the execution of the papers. The mortgage was recorded in the office of the clerk of the circuit court for Clarendon county, both as a mortgage of real estate and as a mortgage of personal property. The estate of Horace Harby is the claimant. I find, as a matter of fact, that the said bond and mortgage were in the first instance intended to be executed and.

delivered to Harby & Co., and were in fact so executed and delivered. I find that subsequently the said bond and mortgage were on January 21, 1907, assigned, transferred, and delivered by Harby & Co. unto the estate of Horace Harby, and the estate of Horace Harby is now the owner and holder thereof.

"Having ascertained these facts, it is evident that the trustee, under ordinary circumstances, would be relegated to his action at law against Harby & Co. to recover any preference which may have been made by the bankrupt to the said Harby & Co., but under the peculiar circumstances of this case, H. J. Harby having acted in a dual capacity, first as the managing partner in the firm of Harby & Co., and, second, as the leading spirit and practically the sole manager of the affairs of the estate of Horace Harby, the estate of Horace Harby would be charged with notice of all facts known to the said H. J. Harby; and, if the execution of said bond and mortgage to Harby & Co. constitutes a preference voidable under section 60b as against Harby & Co., the estate of Horace Harby, as assignee of the said bond and mortgage, could claim no higher rights than Harby & Co., and in the hands of the estate of Horace Harby the said bond and mortgage would likewise be voidable as a preference. 'A creditor will not be permitted to obtain a preference indirectly by transfer of his account, procuring a third party to loan money to the debtor for payment of such creditor, or other colorable device or transaction intended to evade the provisions of the bankruptcy act.' Hackney v. Raymond Bros. & Clarke Co., 10 Am. Bankr. Rep. 218, 94 N. W. 822; In re Beerman, 7 Am. Bankr. Rep. 431, 112 Fed. 662.

"The voluntary petition of the bankrupt was filed herein on the 13th day of February, 1907, and on the 14th day of February, 1907, adjudication of bankruptcy was made. The bond and mortgage in question were executed on November 1st, and were filed for record on the 14th day of November, 1906, so that it is clear that the said bond and mortgage were executed within four months before the filing of the petition herein.

"Section 60a provides:

"'A person shall be deemed to have given a preference if, being insolvent, he has within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procurred or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property; and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class.'

"By section 1 (25) 'transfer' is defined as follows:

"'Transfer shall include the sale and every other and different mode of disposing of or parting with property, or the disposition of property absolutely or conditionally, as a payment, pledge, mortgage, gift, or security.'

"From the testimony herein, and all of the facts and circumstances in this matter, including the sworn appraisal of the bankrupt's estate, and including his accounting for the disposition of his property and funds, I must conclude, and I find as matter of fact, that Andrew J. Tindal was insolvent on the 1st day of November, 1906, the date of the execution of the bond and mortgage in question, and therefore the mortgage to Harby & Co., if enforced, would enable Harby & Co. to obtain a greater percentage of their debt than other creditors of the same class at the time of the execution of the mortgage. Consequently, under the authority of section 60a, the said bankrupt, by the execution and delivery of the said bond and mortgage, gave to Harby & Co. a preference.

"Section 60b, provides as follows:

"'If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property, or its value from such person.'

"Therefore, the only question remaining to be considered is whether Harby & Co. had reasonable cause to believe that the said mortgage was intended as a preference. This is a question of fact, and must be determined from all of the facts and circumstances of the case. The bankrupt testified with ref-

erence to this bond and mortgage (page 1 of the testimony) as follows: 'Q. Here is a mortgage that you gave Harby & Company upon your interest as an heir at law. and distributee of J. E. Tindal, $1,900, May 1st, 1906. Has that mortgage been proven, Mr. Referee? A. No, sir. Q. Is that for a present consideration? A. It was not. Q. I see the amount is $2,431.40. When was that debt contracted? A. $1,900 was for fertilizers obtained in May, 1906, $500 was some funds, and interest added for the funds. Q. You got the money? Did you get that money, $2,431.40, at the time you executed the mortgage? A. No, sir; I got $500, less the interest. Q. When did you get the balance? A. The balance was for fertilizers, nineteen hundred and some odd dollars. Q. When were those fertilizers furnished you? A. In May. Q. The date of the mortgage is May? A. No, sir; November or December, I have forgotten exactly.' On page 49 of the testimony the bankrupt stated, in reply to the examination of the trustee, as follows: 'Q. When did you see this bankruptcy coming on you? A. About the 13th of February. Q. The 13th day of February; why that is the day you filed your petition? A. That is the time I decided to go into bankruptcy. Q. Well, then, when did you find out you could not pay your debts? A. About the same time. Q. In the fall of 1906, were you not pressed for money? Didn't you see then that you could not pay your debts? A. I didn't know, but thought I could make arrangements. Q. That was in the fall? A. In January or December, 1906, I tried to make arrangements.' The only other testimony with reference to the mortgage in question was given by H. J. Harby and Abe Levi, and a copy of this testimony is hereto attached. The testimony of H. J. Harby was substantially as follows: That the bankrupt had been doing business with him for two or three years, and had always paid promptly. That in the spring of 1906 Harby & Co. sold the bankrupt on open account fertilizers amounting to $1,900. That Mr. Tindal had always paid his accounts promptly, and in fact had anticipated payments. That crops were exceedingly short, and that at the maturity of this debt he went to the home of the bankrupt, and asked him for payment. The bankrupt told him he could not pay, and Mr. Harby then asked him for a mortgage of his individual property, and the bankrupt told him that it was already mortgaged, but that he owned an interest in the estate of his father, James E. Tindal, and would give him a mortgage on that interest. Mr. Harby agreed to take the same, and with the bankrupt went to Manning for the purpose of having the papers prepared. Mr. Harby testified that he had no notice of any kind that Mr. Tindal was insolvent, and on the contrary made especial inquiry regarding the loan, and found that it would be a first class loan for him to take. He states that Mr. Tindal told him that 'that' (referring to the Harby debt) and one other matter was about the only matter he had to get straightened up. That when they arrived in Manning, the bankrupt asked him for an additional loan of $500, and he told him, as the security was good, he was willing to let him have it. Mr. Harby stated that Mr. Tindal told him that he had had a disastrous year; what he had been making and what he had made. That he usually made 200 bales of cotton, and had gotten something like 25 or 30 bales. Mr. Harby was asked why he went on the very day the account became due to see Mr. Tindal, and he said: 'It was a pretty hard year, and I knew very well that Mr. Tindal was like a great many other people in Clarendon county, unable to meet their obligations. I figured in my mind, I will go down and take a paper, and will transfer that paper to the estate of Horace Harby, and get my money. Q. You thought he was hard up? A. Yes; everybody was who farmed. Q. Did you know what other concerns Mr. Tindal was dealing with last season? A. I only know by hearsay, from what I heard from Mr. Tindal at that time. I know since, because I have seen. From what Tindal told me, the only debt of any consequence pushing him was the debt due to the Sumter Banking & Mercantile Company. Q. Did he tell you how much that was? A. He said they claimed that he owed them $2,300 or $2,400, but that it was a mistake; he said that he owed them about $1,800.' Mr. Harby further stated that Mr. Tindal mentioned no creditors to him but the Sumter Banking & Mercantile Company, other than the secured creditors for the purchase of lands bought in his own name outside the estate. Mr. Harby further stated as follows: 'Q. You

thought that you were about the only creditor outside of the Sumter Banking & Mercantile Company? A. Except the secured creditors for the purchase of lands that he bought in his own name, outside of the estate, I thought that the banking company and I were the only creditors, and to go further, his business relations were so obscured as to other parties that it has not been thirty. days since the attorney for the estate of James E. Tindal requested to know where that mortgage was, as he wanted the estate of Tindal to take it up, not knowing of these other ·debts. Q. When was that? A. About thirty days ago—possibly forty-five. Q. Can't you recollect about the time? A. I say about thirty or forty-five days ago. I said "No" that mortgage is in the estate of Horace Harby, and we made it for an investment, and we want it.' It was stated in open court by Mr. Cuttino, one of the attorneys engaged in the matter, that he was the attorney representing the estate of Tindal, who had made the offer to Mr. Harby to purchase the bond and mortgage for the estate, and as late as that time the estate of Tindal had no idea that A. J. Tindal was insolvent. Mr. Harby stated that he never knew that Tindal was in financial trouble until he saw his mules advertised, or his attention was called to the mules being sold in front of the courthouse at Sumpter by O'Donnell & Co. The time was shown to be in January, 1907. He stated that the bond and mortgage were drawn at short time because Mr. Tindal expected to be able to pay when due, and he had partially agreed to extend the time. Mr. Levi testified merely in substance that before Mr. Harby took the mortgage he asked his opinion as to the value of the security. It is evident that the only fact known to Mr. Harby was that crops were generally short in that county, and that Mr. Tindal likewise had short crops; that Mr. Tindal's individual property was mortgaged; that is to say, his real estate and some of his live stock. This was in November, when the crops were being gathered, and before the business of the season was wound up and the result of the year's business could be ascertained. While Mr. Tindal must have known of his financial condition, he could not have known whether he would be able to obtain extensions of time and go on with his business or not.

"The burden of proof is on the trustee to show that Mr. Harby had reasonable cause to believe that a preference was intended. By section 1 (15) of the bankruptcy act, insolvency is defined: 'A person shall be deemed insolvent, within the provisions of this act, when, if the aggregate of his property, exclusive of any property which he may have conveyed, transferred, sold, or removed, or permitted to be sold or removed,. with intent to hinder and delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts.' And in Re Eggert, 4 Am. Bankr. Rep. 458, 102 Fed. 738, the court say: 'In this respect the act is widely different from the act of 1867. There the term "insolvency" was construed to mean an inability to meet one's obligations as they mature in the ordinary course of business. The term "insolvency" in the present act is equivalent to the term "bankruptcy" in the former act. While, therefore, rulings under the former act are inapplicable in a certain sense, because of this difference in the meaning of the term insolvency, they do apply so far as they determine the principles of law by which it is to be ascertained whether a creditor receiving a preference had reasonable cause to believe that the debtor had not at the time property sufficient, at a fair valuation, to pay all of his debts.' And in Re Eggert, 3 Am. Bankr. Rep. 541, 98 Fed. 843, it was held: 'To constitute a voidable preference, as defined in section 60a and section 60b, the creditor must have reasonable cause to believe the debtor to be insolvent in fact, as the foundation for a reasonable cause to believe that an unlawful preference is intended.' In Brandenberg on Bankruptcy (page 341) the author says: 'A knowledge of facts and circumstances, or the existence of a condition of facts with a knowledge of which he is chargeable, which would put a prudent man upon inquiry, is a reasonable cause to believe a debtor insolvent; and, if a creditor had reasonable cause when taking a preference to believe the debtor insolvent, it makes no difference of what he thought or knew of the debtor's intention in giving the preference. The intention of the creditor is not to be considered.' In Peck v. Connell, 8 Am. Bankr. Rep. 504, the court say: 'The right of a trustee to avoid a preference and recover the property is made to depend, not only upon the act and state of mind of the giving debtor, but the state of

mind of the receiving creditor must also be considered. It is not enough that an advantage in fact be given, but to make it voidable the person receiving it or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference. The debtor must have intended to prefer, and the creditor must have had reasonable cause to believe that such intention existed. * * * The bankruptcy act does not take from the creditor all incentive to vigilance; he may still collect his claim from an insolvent debtor by legal process. Such process does not fall within the band of the bankruptcy act, unless the creditor shall have had reasonable cause to believe that it was intended thereby to give a preference. The intention of the creditor to obtain a preference is not condemned. * * * Knowledge or reasonable cause to believe that a preference is intended involves knowledge of a reasonable cause to believe that insolvency exists as a matter of fact.' Savings Bank v. Jewelry Co., 12 Am. Bankr. Rep. 781, 99 N. W. 121; Barbour v. Priest, 103 U. S. 293, 26 L. Ed. 478. In the case of Grant v. Bank, 97 U. S. 80, 24 L. Ed. 971, the court say: 'It is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency in order to invalidate a secured payment for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further, he may feel anxious about his claim, and have a strong desire to secure it, and yet such belief as the act requires may be wanting. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by the law. Receiving payment is put in the same category in the section referred to as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside, and yet this could be done in a large proportion of cases if mere grounds of suspicion of their insolvency were sufficient for the purpose. The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate, and his creditors, if they know anything of his embarrassment, either participate in the same feeling, or at least are willing to think, that there is a possibility of his succeeding. To offer to hold and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankruptcy law an engine of oppression and injustice. It would in fact have the effect of producing bankruptcy in many cases where it might otherwise be avoided.' This doctrine was reaffirmed in Stuckey v. Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640. In Hackney v. Raymond Bros. & Clarke, 10 Am. Bankr. Rep. 216, 94 N. W. 823, it was held: 'That notice that a debtor has not paid a claim at maturity is not necessarily a conclusive notice of insolvency under the present law.' In the case of Eggert, 4 Am. Bankr. Rep. 450, 102 Fed. 742, the court say: 'The only fact brought home to the creditor, and which it is claimed should have aroused inquiry, is that he was somewhat behind in the prompt payment of his obligations. We cannot say, as a conclusion of law, that knowledge of that fact, standing alone, was sufficient to put the creditor on inquiry. Indeed it may be said that a majority of merchants, absolutely solvent in the sense in which the term is employed in the bankruptcy act, are not at all times able to promptly meet their obligations as they mature. To hold that a creditor receiving payment of or security for a past-due debt is by the mere fact of knowledge that the debt is past maturity put on inquiry of his debtor's inability to pay all of his debts, and that under such circumstances is receiving payment or security at his peril, would be to put at hazard many business transactions and make the act oppressive.' In Dutcher v. Wright, 94 U. S. 553, 24 L. Ed. 130, the court say: 'If it appears that the debtor giving the preference was actually insolvent, and that the means of knowledge were at hand, and that such facts and circumstances were known to the creditor seeking the preference as clearly to have put a prudent man upon inquiry, it

must be held that he had reasonable cause to believe that the debtor was insolvent, if it appears that he might have ascertained that fact by reasonable inquiry.'

"There is no showing here that Tindal himself was conscious of his insolvency on November 1, 1906; there is no statement of his assets and liabilities; there is no showing that Mr. Harby could have known who Mr. Tindal's creditors were other than those named to him by Mr. Tindal, and those of whom he is to be held to have had constructive notice by reason of the public records; there is no proof as to the extent of Mr. Tindal's means; there is no showing that there was even a suspicion of his insolvency in the minds of the public at that time. The public records disclose the fact that Mr. Tindal's interest in his father's estate, which was supposed to be of considerable value, was unincumbered and that his crops were unincumbered. Mr. Harby was a diligent creditor. In the case of Sirrine v. Stover, Marshal & Co., 64 S. C. 457, 42 S. E. 432, the court say: 'The rule established by the decisions of the United States Supreme Court as to the meaning of the words reasonable cause to believe, etc., under the act of 1867, is applicable in determining the meaning of the words reasonable cause to believe it was intended as a preference under the act of 1898; since a reasonable cause to believe a preference was intended by the debtor involves a reasonable cause to believe the debtor insolvent, as a preference depends on insolvency.' The courts say further: 'In determining whether the taking of a security by a creditor constitutes an illegal preference under the bankruptcy act of 1898 (section 60b), the creditor is not to be charged with knowledge of his debtor's financial condition from mere nonpayment of his debts, or from circumstances which give rise to mere suspicions in his mind of possible insolvency. On the other hand, it is not essential that the creditor should have actual knowledge of or belief in his debtor's insolvency, but it is sufficient if he has reasonable cause to believe him insolvent. If facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose.'

"It was conceded by the counsel in the case that to the extent of the $500 advanced by Mr. Harby at the time of the taking of the mortgage referred to there was no question, and that to that extent the estate of Harby must be considered a secured creditor. Under the facts and circumstances incident to the execution of the bond and mortgage referred to, I must conclude that the trustee has failed to show that Mr. Harby had reasonable cause to believe that the bankrupt intended to give a preference, and the claim of the estate of Harby must be allowed as a secured claim.

"In the course of these proceedings, on April 10, 1907, an order was made that the property of the bankrupt be sold by the trustee, and in and by said order it was provided that the property sold and disposed of be held to be valued as follows, to wit: 'The interest of the bankrupt in the real estate of the estate of J. E. Tindal, $4,000, the personal property of the bankrupt, $1,000, and the interest of the bankrupt in the personal estate of James E. Tindal of no value, by reason of the claims and off-sets held by and due to the estate of J. E. Tindal.' And in and by said order it was further provided: 'That the funds derived from the sale of the property of the bankrupt be kept in separate accounts by the trustee; that is to say, that separate accounts be kept of the funds derived from the sale of the real estate and of the funds derived from the sale of the personal property.' And the said order further provided: 'That the funds derived from the sale of the said property shall be held by the trustee to answer in the place and stead of the specific property sold to such creditor as may hold claims or incumbrances upon the said property, and which may hereafter be allowed as secured claims; and that the rights of all creditors claiming securities as against specific property be preserved as against the funds in the hands of the trustee.'

"It was conceded that the mortgage held by the estate of Harby, and above referred to, was a first lien in order of priority upon the interest and share of the bankrupt in the estate of James E. Tindal; hence it is ordered that the claim of the estate of Horace Harby be, and the same is hereby, allowed as a secured claim for the sum of $2,442.43, with interest thereon from the 1st day

of November, 1906, at the rate of 8 per cent. per annum, payable annually, and the further sum of 10 per cent. upon the amount so due to cover attorneys' commissions, the same being provided for and secured by the terms of the said bond and mortgage, and that the amount so allowed shall be first paid out of the fund of $4,000 derived from the sale of the interest of the bankrupt in the estate of James E. Tindal.

"On the 11th day of March, 1907, G. Manly Norris offered proof of indebtedness due him by the bankrupt, and demanded that the said account be filed and allowed as a secured claim; the security being a mortgage executed by the bankrupt to the claimant on the 5th day of February, 1907, covering the interest of the bankrupt in and to the estate of J. E. Tindal, both real and personal property. This mortgage was only recorded as a mortgage of real estate. At the same time Mrs. H. H. Norris offered for allowance as a secured claim proof of her account against the bankrupt; the security consisting of a mortgage executed by the bankrupt to the claimant on the 2d day of January, 1907, covering the interest and share of the bankrupt in and to the real estate of the estate of J. E. Tindal.

"In view of the fact that the interests of the bankrupt in the personal estate of J. E. Tindal has been held to be of no value, it is needless to consider the question involved as to the failure to record the mortgage of G. M. Norris as a mortgage of personal property.

"The trustee objected to the allowance of these claims as secured claims, on the ground that the same constituted preferences, under section 60a, and section 60b of the bankruptcy act, and that they were voidable by him for that reason, and on the further ground that the same were void under section 67e of the said act. Inasmuch as the facts are somewhat different, it will be necessary to consider these mortgages separately: In the case of the mortgage of G. Manly Norris, the testimony of the bankrupt is that the mortgage was given to secure an antecedent debt, contracted in May, 1906, and maturing October 1, 1906; that in the latter part of December, 1906, or 1st of January, 1907, the bankrupt had prepared and signed a mortgage covering his interest in the estate of J. E. Tindal in favor of the claimant for the sum of $7,000, and that he went to the claimant, and asked him to make a further advance of $6,000, and take the mortgage as security for such advance and for the sum then due him. At that time the creditor had made no effort to collect his debt, and had required no security. Mr. Norris testified that he refused to make the further advance for the reason that he suspected that the amount wanted would not pay the indebtedness then due by the bankrupt. In answer to the question, 'Q. Were you willing to make him the loan for $7,000?' he says, 'I was willing to make him the loan until I found out exactly how the matter stood, and then I declined to make the loan.' He was asked why he did not make further advances under the mortgage, and he stated that he suspected that it would not pay all of the accounts, and he therefore declined to go further with it. He was then asked: 'Upon making that determination. what did you do? A. Then I asked him to give me a mortgage for the $1,000 that he owed me in lieu of this $7,000 that he had already given. Q. At the time of taking that mortgage for $1,000, did you know of his financial condition better than when you took the mortgage for the $7,000? A. No; I didn't know it. I suspected that it would not pay his accounts.' Mr. Norris was the father-in-law of the bankrupt. The mortgage for $7,000 was not offered in evidence. When this mortgage was presented to him, Mr. Norris evidently undertook to make some investigation, and found such a state of facts as caused him to refuse to make further advances, and to demand security for the indebtedness then due him.

"The principle is well established that courts will scrutinize transactions between relatives with exceeding particularity. I held above that Mr. Tindal was insolvent on November 1, 1906. No showing was made that there was any improvement in his condition subsequent to that time, and I am forced to hold that he was likewise insolvent at the time of the execution of the mortgage to G. M. Norris, and that the enforcement of this security would enable Norris to obtain a greater per centage on his debt than other creditors of the same class. This was within four months of the adjudication in bankruptcy.

"The only question to be determined is, did G. M. Norris have reasonable

cause to believe that the said mortgage was intended as a preference? I conclude that the claimant had knowledge of such facts as would put a reasonable man upon inquiry, and consequently, under the decisions above cited, the claimant is chargeable with knowledge of facts which such inquiry would reasonably be expected to disclose. These facts would have been the insolvency of Tindal and his intention to prefer the claimant. ·

"It is therefore ordered that the claim of G. Manly Norris be disallowed as a secured claim, but that the same be allowed as an unsecured claim.

"The facts and circumstances attending the execution of the mortgage to Mrs. Norris are somewhat dissimilar from those attendant upon the execution of the bond and mortgage to Mr. Norris. It is true that Mrs. Norris was the mother-in-law of the bankrupt. She dealt with him on her own account. Mr. Tindal owed her $3,000, advanced to him in the spring of 1906, and due November 1, 1906. Mrs. Norris knew that crops were short. She did not desire to press her son-in-law, and made no demand upon him. On January 2, 1907, the bankrupt came to her, and offered to her a mortgage to secure her if she would agree to extend the time for payment. To this she assented. She had no knowledge of his financial condition, and the only facts known to her were that crops were short, and that Mr. Tindal stated he could not then pay the money, and that he volunteered the security. Were these such facts as would put a reasonable person on inquiry? Did she have reasonable cause to believe that Tindal intended a preference? I think not, and it is therefore ordered that the claim of Mrs. H. H. Norris be, and the same is hereby, allowed as a secured claim for the sum of $3,000, with interest thereon at 7 per cent. per annum from the 2d day of January, 1907, and that the same be paid out of the fund of $4,000 derived from the sale of the real estate of the bankrupt next after the payment of the debt allowed in favor of the estate of Harby, or so much thereof as said fund shall pay, and as to any deficiency, that the said claimant Mrs. H. H. Norris be entitled to share as an unsecured creditor in any other funds of the bankrupt estate. ·

"Under the views which I have taken of the mortgages of Mr. and Mrs. Norris, it is needless to consider the objection of the trustee that the same were executed in contravention of section 67e of the bankruptcy act."

BRAWLEY, District Judge. This case comes up on a review of the report and order of I. C. Strauss, Esq., referee, dated May 29, 1907, allowing as valid a mortgage executed by the bankrupt November 1, 1906, to A. D. Harby, executor and trustee, for $2,442.43, and a mortgage dated January 2, 1907, to Mrs. H. H. Norris for $3,000, and disallowing a mortgage dated February 5, 1907, for $1,000 to G. Manley Norris. The bankrupt filed his voluntary petition, and was adjudicated bankrupt February 13, 1907. All of these mortgages would have been void under the bankrupt act prior to the amendment of February 5, 1903, in that they were executed within four months before the filing of the petition, when the bankrupt was insolvent, and by them the creditors named obtained a greater percentage of their debts than any other creditors of the same class. The main object of the bankrupt act, and one of its most beneficial results, was an equal distribution among his creditors of the estate of the bankrupt. The effect of the amendment referred to is in most cases to practically defeat this beneficial intent, for it becomes necessary now to prove that the party receiving the preference had reasonable cause to believe that it was intended thereby to give the preference. The referee in this case had opportunity, which this court has not, of seeing in person the parties to this transaction, of observing their demeanor, and determining their credibility. The circumstances were suspicious, the mortgages were executed when the bankrupt was gravely embarrassed,

and within less than four months of the date of filing the petition, when it appeared that he was hopelessly insolvent. It appears that the bankrupt had in the year 1905 planted and raised a large crop of cotton, had paid off large sums of money advanced in the raising of the crop, and was in excellent credit; that he was a young man of unusual energy and skill and of buoyant disposition, and that, encouraged by his success in 1905, he planted very largely in 1906, securing large advances, whereby he was enabled to advance to tenants and others, having under his control about 79 ploughs. The year 1906, owing to weather conditions, was a disastrous one in the county where he lived, and the crop of that year was wholly insufficient to realize an amount sufficient to pay his indebtedness, but his father, who was a man supposed to be of large means, having died that year, it was thought that he would share a considerable inheritance, and it appears that his credit, therefore, was not greatly impaired. Being of sanguine disposition and energy, he expected to secure advances and to go on planting upon a large scale in the year 1907. He had among his assets claims against the tenants and others to whom he had made advances in 1906 amounting to about $20,000, and it was his hope and expectation that, if he succeeded in raising the money necessary to continue his planting operations in 1907, he would secure payment of this indebtedness, and, so far as appears from the testimony and from the finding of the referee, it was not until within a few days prior to the filing of the petition in bankruptcy that, being unable to procure the necessary advances, he realized his true condition, and filed his petition in bankruptcy. Harby, a merchant in Sumter, had sold him goods during the year 1906, taking no note or security; thus showing entire faith in the good credit of the bankrupt. It was understood between them that the money was to be paid about November 1st, and, not receiving payment, he went to the plantation of the bankrupt about November 1st, obtained a mortgage, and transferred it to the estate of his father, of whom he was one of the executors, thus obtaining the money needed in his business. Harby has testified that at that time he did not believe that the bankrupt was insolvent, and had no ground for believing that this mortgage was intended as a preference. The referee has found as a fact that the creditor had no reasonable cause to believe that the mortgage was intended as a preference, and that he had no knowledge of the real pecuniary condition of the bankrupt. Mr. Frost, the largest creditor, whose claim amounts to about ————, lived in Charleston. There is no testimony showing that the amount of this indebtedness was known to Harby or in that neighborhood. In the usual course of business, such fact was not likely to be made public, and, although it was well known that the crops were very short that year, it did not necessarily follow that all the planters in that region were insolvent. I do not find in the testimony sufficient ground to reverse the referee's conclusion as to the Harby mortgage, and it is therefore affirmed.

The next mortgage is that to Mrs. H. H. Norris for $3,000, dated January 2d. It appears that Mrs. Norris was the mother of the bankrupt's wife, and naturally any transactions between the bankrupt and members of his family required close scrutiny. The common instincts

155 F.—30

·of human nature incline one in failing circumstances to provide for those of his own household, and the nearest of kin are likely to be preferred. ·It appears from the testimony that the bankrupt had borrowed this money from his mother-in-law early in the year 1906, to be repaid in the autumn, when his crop was sold; that in the autumn, finding his crop short, he proposed to his mother-in-law to extend the loan, and executed this mortgage January 2, 1907, in order to secure it. There is no testimony that Mrs. Norris was acquainted with the bankrupt's actual condition. She lived in another county, separated by a river, and it appears that her son-in-law and his wife, according to the testimony, were in the habit of paying a yearly visit. The same ·considerations which led the referee to the conclusion that Harby had no reason to believe in accepting the mortgage that a preference was intended has led him to a like conclusion with respect to the mortgage ·to Mrs. Norris, and his order respecting it is affirmed.

Next is the mortgage to G. Manley Norris for $1,000, executed February 5, 1907. This was only eight days before the petition in bankruptcy was filed, when all hope of weathering the storm must have been abandoned, and there is testimony tending to show sufficient knowledge on the part of the mortgagee of the bankrupt's actual con·dition as to put him upon inquiry, and, as that inquiry would have ·demonstrated a hopeless condition of insolvency, the referee's conclusion that this mortgage is void, because the creditor had reasonable cause to believe that a preference was intended, will not be disturbed.

The able and well-considered report of the referee, stating all the facts and the law applicable thereto, renders further review unnecessary.

The orders made by the referee in accordance with the said report are affirmed.